## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUMP OLD POST OFFICE LLC,** ) | |
| 1100 Pennsylvania Ave NW ) | |
| Washington, DC 20004 ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Case No. 15-1238 |
| ) | |
| **TOPO ATRIO LLC**, ) | |
| 717 D Street NW, 6th Floor ) | |
| Washington, D.C.  20004 ) | |
| ) | |
| and ) | |
| ) | |
| **THINKFOODGROUP LLC** ) | |
| 717 D Street NW, 6th Floor ) | |
| Washington, D.C. 20004 ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## COMPLAINT

Plaintiff Trump Old Post Office LLC ("Landlord"), by its undersigned counsel, files this

complaint, asserting claims for breach of contract, action on a guarantee, and attorneys' fees against

defendants Topo Atrio LLC ("Tenant") and ThinkFoodGroup LLC ("Guarantor") arising from

Tenant's breach and ultimate abandonment of its obligations under the sublease it had entered into

for certain restaurant space at the Trump International Hotel, The Old Post Office, Washington D.C.

As a result of Tenant's breach, on July 17, 2015, Landlord notified Tenant that it was in default

under the sublease.  On July 31, 2015, Landlord terminated and canceled the sublease following

Tenant's failure and refusal to cure its default.  Landlord now seeks to recover monetary damages

against both Tenant and Guarantor pursuant to the terms of the sublease and guarantee.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between plaintiff and defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.      Venue is proper pursuant to 28 U.S.C. § 1391 because one or more defendants reside in this district, the conduct complained of occurred in this district, and the property that is the subject of this complaint is located in this district.

## PARTIES

3.      Landlord is a limited liability company whose members are citizens of Delaware and New York.

4.      Tenant is a limited liability company whose members, on information and belief, are citizens of Washington, D.C.

5.      Guarantor is a limited liability company whose members, on information and belief, are citizens of Washington, D.C.

## FACTS

6.      Pursuant to an August 8, 2013 master ground lease (the "Master Lease") with the United States of America – General Services Administration, Landlord leases the building located at 1100 Pennsylvania Avenue NW, Washington, D.C. commonly known as the "Old Post Office" (the "Building").  The Building, built in 1899, is an historic and architecturally distinctive property which served as the city's main post office until 1914 and remains the second tallest structure in the nation's capital after the Washington Monument.

7.      In 2014, Landlord broke ground on a $200 million plus renovation of the Building. Upon completion, the Building will be known as the Trump International Hotel, The Old Post Office, Washington D.C. (the "Hotel"), consisting of 263 luxury guestrooms and suites, 36,000

2

square feet of meeting and event space, an opulent 13,000-square-foot Grand Ballroom and a 5,000 square-foot super luxury spa and state-of-the-art fitness center, making it one of the finest hotels in the nation's capital and the world.

8.      On or about November 19, 2014, Landlord and Tenant entered in an agreement of sublease (as amended by the First Amendment, the "Sublease") pursuant to which Tenant, led by renowned chef, José Andrés, agreed to lease for a ten (10) year term of approximately 9,018 square feet of space in the Grand Cortile of the Building (the "Demised Premises") to operate a José Andrés flagship restaurant.  Unless otherwise noted, all defined terms contained herein shall have the same meaning as in the Sublease.

9.      On or about November 24, 2014, Landlord and Tenant entered in that certain first amendment to agreement of sublease (the "First Amendment") amending the terms of the Sublease.

10.     On or about November 19, 2014, Guarantor executed a certain guaranty (the "Guaranty") pursuant to which Guarantor agreed to guarantee to Landlord the full and prompt performance of all of Tenant's obligations under the Sublease.

## The Sublease

11.     Pursuant to the terms of the Sublease, Tenant was obligated to use and occupy the Demised Premises as a first class, high quality, flagship, top-tier Washington, D.C. restaurant consistent with the Operating Standards.

12.     Specifically, Section 4(a) of the Sublease provides in this regard as follows:

> Tenant shall use and occupy the Demised Premises for a first-class in all respects, fine dining restaurant, adhering to the concept described in Exhibit F to this Sublease (the "Style Concept") and serving as the José Andrés Hospitality Flagship, all in strict accordance with the Operating Standards and other provisions of this Sublease, and for no other purpose.

3

13.     The Sublease also imposes a series of material obligations on Tenant to build-out the

Demised Premises as "a first-class high quality restaurant" pursuant to an agreed upon timeline.

14.     Section 7(b)(iii)(A) of the Sublease provides in this regard, as follows:

> Tenant shall perform all work necessary to build-out the Demised Premises as a first-class high quality restaurant consistent with top tier restaurants in Washington D.C. and the other facilities within the Building with a high-design finish and consistent with the Initial Conceptual Design Documents.   Tenant shall deliver all items set forth on Exhibit D3 (the "Tenant's Work Timeline") as requiring submittal and cause the occurrence of each fact or circumstance listed as a Critical Milestone on Tenant's Work Timeline, in each case on the dates set forth therefor on the Tenant's Work Timeline.

15.     Similarly, Section 7(b)(iii)(E) of the Sublease, entitled "Performance of Tenant's

Work," provides, as follows:

> Tenant shall cause to be performed at Tenant's expense all of the work depicted or described in the Tenant's Plans (the "Tenant's Work").

16.     Exhibit D3 to the Sublease, entitled "Tenant's Work Submittal List and Milestone

Dates," sets forth a series of deadlines by when Tenant must submit and/or complete, as applicable,

various plans, permits, documents and milestones.  Included on Exhibit D3 is the requirement that

Tenant deliver to Landlord "90% Completed Construction Documents" on or before the "Delivery

Date" of "June 29, 2015."

17.     Section 22(a) of the Sublease, entitled "Events of Default," states that "[e]ach of the

following shall constitute a breach of this Sublease by Tenant ("Event of Default"):"

> xiii.     Tenant shall fail to deliver any Budget, document, Permit, schedule or other item listed as an item that requires submittal on Exhibit D3 on or before the date set forth on Exhibit D3 and such failure continues for a period of ten (10) days after Landlord gives Tenant notice thereof specifying the items Tenant failed to deliver …

18.     Section 22(c) of the Sublease states that if at any time Tenant is in default of the Sublease, "Tenant shall not be entitled to exercise any right of cancellation or termination or other option granted to it by this Sublease (if any)."

19.     Section 23(a) states that if an Event of Default occurs, Landlord may deliver to Tenant "Landlord's Cancellation Notice" informing Tenant that Landlord is cancelling the Sublease, in which case the Sublease shall expire and the Term shall end as if it is the last day of the Term of the Sublease.

20.     If Landlord shall deliver Landlord's Cancellation Notice to Tenant, pursuant to Sections 23(c and d), Landlord shall be entitled to draw down upon the Letter of Credit delivered by Tenant pursuant to Section 26 of the Sublease and also recover from Tenant all unpaid Base Rent, Percentage Rent and Additional Rent due and owing under the Sublease together with all monetary damages, costs and fees sustained by Landlord, along with all of Landlord's costs and attorneys' fees associated with its enforcement of the terms of the Sublease.

21.     Section 23(j) makes clear that "[t]he remedies provided for in this Sublease shall not preclude Landlord from any other remedy, in law or in equity" and that Landlord's "cancellation or termination" shall not "deprive Landlord of any of its remedies or actions against the Tenant" for rent or any other sums which would otherwise come due "as if there had been no cancellation or termination."

22.     Section 25 states not only that Tenant shall be responsible to pay Landlord for all costs and expenses it incurs by reason of Tenant's breach of the Sublease, but that, in any action or proceeding brought to enforce the terms of the Sublease, the "substantially prevailing party shall be entitled to recover from the other reasonable attorneys' fees and other out-of-pocket costs."

20542867v.1

23.     Section 27 states that (a) Landlord and Tenant waive their right to a jury trial in any action or proceeding involving the Sublease, (b) the Sublease shall be governed by the laws of the District of Columbia, and (c) Landlord and Tenant agree that any dispute between them shall be heard in either the Superior Court of Washington D.C. or in the federal district courts located in Washington D.C.

24.     Section 38 provides that (a) Landlord has not made and Tenant is not relying upon any warranties, representations, promises or statements except to the extent expressly set forth in the Sublease and (b) "all prior understandings and agreements … are merged in the Sublease which alone fully and completely express the agreement of the parties and which are entered into after full investigation."

**The Guarantee**

25.     As a "material and necessary inducement to Landlord's execution and delivery of the Sublease" and Landlord's concession with respect to certain construction expenses, Tenant agreed to "execute and deliver" the Guarantee to Landlord.

26.     In the Guarantee, the Guarantor "absolutely, unconditionally and irrevocably . . . guarantees to Landlord the full and prompt performance and observance of all of Tenant's obligations under the Sublease, monetary and nonmonetary."  Guarantee, Section 2.

27.     The Guarantee also provides, in relevant part, that "[t]he liability of Guarantor . . . is coextensive with that of Tenant," and that the "Guarantee shall be enforceable against Guarantor." *Id.*, Section 3.  The Guarantee further provides that Guarantor's liability under the Guarantee is "primary" and that, at Landlord's option, the Guarantor can be "joined in any action against said Tenant in connection with the Sublease." *Id.*, Section 12.

28.     Similar to the Sublease, the Guarantee waives a trial by jury, *Id.*, Section 14,

provides for the payment of attorneys' fees to Landlord in actions on the Guarantee, *id.*, and is

governed by law of the District of Columbia, *Id.*, Section 16.

**Tenant Defaults and Abandons its Obligations Under the Sublease**

29.     On June 29, 2015, Tenant was to have delivered to Landlord "90% Completed

Construction Documents" pursuant to its obligations under Section 7(b)(iii)(A) and Exhibit D3 of

the Lease.  Tenant failed to deliver these documents.

30.     On July 8, 2015, less than eight (8) months after Tenant entered into the Sublease,

Tenant's co-owner and executive chef, Mr. Andrés, was quoted in *The Washington Post* as stating

that it was "impossible" for him and his company to open his restaurant in the Demised Premises.

These comments reflected an apparent abandonment of Tenant's obligations under the Sublease.

31.     Mr. Andrés' stated refusal to proceed with his obligations under the Lease were

allegedly based on his personal offense to statements made by Mr. Trump with respect to illegal

immigration during his June 16, 2015 presidential campaign announcement speech.  Mr. Andrés'

offense is curious in light of the fact that Mr. Trump's publicly shared views on immigration have

remained consistent for many years, and Mr. Trump's willingness to frankly share his opinions is

widely known.

32.     Notwithstanding Mr. Trump's well-known frankness, in a January 2015 press release

announcing the Sublease, Mr. Andrés praised Mr. Trump for his "business acumen" and said he was

"proud to partner" with him, explaining:

> I have long respected Donald Trump for his business acumen and am
> proud to partner with him to create a truly remarkable, fine dining
> restaurant in the city I have called home for many years, right in the
> heart of the historic Post Office.

33.      On July 17, 2015, Landlord sent Tenant (and Guarantor) a Notice of Default ("Landlord's Default Notice") informing Tenant that, due to its failure to deliver to Landlord "90% Completed Construction Documents" on or before the "Delivery Date" of "June 29, 2015," Tenant was in material default of its obligations under Section 7(b)(iii)(A) and Exhibit D3 of the Sublease, which default Tenant had ten (10) days to cure.

34.      Also on July 17, 2015, Tenant sent Landlord a notice of its own alleging that, as a result of the content of Mr. Trump's June 16 announcement speech, Landlord had allegedly constructively evicted Tenant from the Demised Premises as well as violated the covenants of quiet enjoyment and good faith and fair dealing.

35.      Tenant demanded as a "cure" for this alleged breach that Landlord recant his personal opinions, and that Landlord somehow "ensure" that Mr. Trump's personal opinions "not be repeated, restated, or further disseminated."

36.      Tenant's July 17, 2015 notice to Landlord not only sought to control what Mr. Trump could say, it failed to cite to any provision from the Sublease that Landlord had purportedly violated.  This is because there are no provisions in the Sublease that grant Tenant the right to terminate the Sublease based upon personal offense with respect to comments made by Landlord, its principals or affiliates, including Mr. Trump.  There are similarly no provisions in the Sublease that grant Landlord the right to terminate the Sublease based upon comments made by Tenant, its principals or affiliates, including Mr. Andrés.

37.      Tenant can point to no other agreements between it and Landlord, its principals or affiliates, including Mr. Trump, protecting Tenant from personal offense.  Indeed, Mr. Andrés never sought such a provision in the Sublease. Section 38 of the Sublease provides that it represents the entire agreement and that Tenant is not relying upon any other promises by Landlord.

8

38.     By letter dated July 20, 2015, Landlord rejected Tenant's purported default notice, explaining, among other things, that Mr. Trump was not a party to the Sublease, that Landlord had done nothing to breach the Sublease or otherwise interfere with Tenant's ability to use, occupy and enjoy the Demised Premises, and that Landlord could not possibly have constructively evicted Tenant given that Tenant had not yet taken occupancy of the Demised Premises.

39.     Without justification, on July 28, 2015, Tenant informed Landlord that Tenant was "terminating the Sublease because of Landlord's default."

40.     In response, by letter dated July 28, 2015, Landlord advised Tenant that, insofar as "Tenant has no right of termination under the Sublease," Tenant's July 28, 2015 termination notice was "rejected as a nullity" and that, "to the extent Tenant desires to avoid an Event of Default and termination of the Sublease … we urge Tenant to act promptly and deliver '90% Completed Construction Documents' to Landlord by the close of business on July 30, 2015."

41.     Despite Landlord's reminder, Tenant not only failed and refused to cure the defaults set forth in Landlord's Default Notice, but has remained steadfast in its refusal to comply with any of its obligations under the Sublease.  In short, Tenant, having attempted to terminate the Sublease, has altogether abandoned its rights and obligations thereunder.

42.     Based upon the foregoing, on July 31, 2015, Landlord sent Tenant (and Guarantor) "Landlord's Cancellation Notice" informing Tenant that, based on Tenant's failure to cure the defaults in the Default Notice, Landlord was exercising its right to terminate and cancel the Sublease and end the Term.

## Landlord's Substantial Damages

43.     The restaurant space that Mr. Andrés has suddenly abandoned is slated to be in the center of the hotel, adjacent to the lobby and a visual focal point for all the perimeter guest rooms

20542867v.1

that line the nine-story atrium.  In addition to Landlord's obligation in the Master Lease to operate a "signature" restaurant, it is indisputably harmful to open a luxury hotel without its planned restaurant, much less one undergoing construction as will now be required. This is why the parties to the Sublease negotiated numerous provisions to ensure that the design, approval, and construction remained on schedule.  As such, it is not an option for Landlord allow the Demised Premises to sit vacant.  Instead, Landlord must promptly move forward with plans to find a new signature restaurant.  Toward that end, Landlord has been forced to hire a new architect to quickly prepare new designs and plans for the Demised Premises.

44.     As a result of Tenant's decision to abandon its obligations under the Sublease at this late date, Landlord has already suffered and will continue to suffer millions of dollars in costs, expenses, losses and other damages.  In addition to the loss of Base Rent, Percentage Rent and Additional Rent, Landlord must now attempt to reprogram the Demised Premises with a new signature restaurant. Accordingly, Landlord will be forced to incur significant costs and expenses including, without limitation, additional legal fees, brokerage commissions, tenant allowances and credits, the cost of building out, altering and preparing the Demised Premises for a new tenant, advertising expenses and the expense of maintaining the Demised Premises in good condition. In the event Landlord is unable to find a timely replacement, Landlord will be forced to design and develop a restaurant itself at significant cost.  In addition, Landlord will no longer receive guaranteed rent for this space and will be required to cover any operational shortfalls.

45.     As a result, Landlord's damages have and will continue to multiply.

## COUNT I
### (Breach of Sublease)

46.     Landlord repeats and realleges each and every allegation as if fully set forth at length herein.

10

47.     The Sublease is a fully enforceable contract, supported by consideration, and was negotiated by sophisticated commercial parties at arm's length.

48.     Pursuant to the terms of the Sublease, in exchange for the payment by Tenant of certain Base Rent, Percentage Rent and Additional Rent as well as Tenant's agreement to build-out the Demised Premises into and continuously use, occupy and operate same as a first class, high quality, flagship, top-tier Washington, D.C. restaurant, Landlord agreed to lease the Demised Premises to Tenant for a ten (10) year Term.

49.     Tenant has breached the Sublease by failing to abide by its requirements, including by providing construction documents as required, by repudiating its obligations to operate a restaurant, and by purporting to terminate the Lease on grounds not allowed under the Sublease.

50.     By reason of Tenant's actions, Landlord has suffered and will continue to suffer damages in an amount to be determined at trial, but believed to be in excess of $10 million.

## COUNT II
### (Action on Guarantee)

51.     Landlord repeats and realleges each and every allegation as if fully set forth at length herein.

52.     The Guarantee is a fully enforceable contract, supported by consideration, and was negotiated by sophisticated commercial parties at arm's length.

53.     Pursuant to its terms, Guarantor is fully liable for Tenant's breach of the Sublease and, at Landlord's option, Landlord can and is hereby joining Guarantor in this action to hold Guarantor fully liable for Tenant's breaches.

54.     By reason of Tenant's actions, Landlord has suffered and will continue to suffer damages in an amount to be determined at trial, but believed to be in excess of $10 million.

20542867v.1

**COUNT III**
(Attorneys' Fees)

55.      Landlord repeats and realleges each and every allegation as if fully set forth at length herein.

56.      Section 25 of the Sublease entitles the "substantially prevailing party" in any action or proceeding to recover its reasonable costs and attorneys' fees:

> if any legal action, arbitration or other proceeding is brought to enforce or interpret this Sublease, the substantially prevailing party shall entitled to recover from the other reasonable attorneys' fees and other out-of-pocket costs (including expert fees), in addition to any other award to which the substantially prevailing party may be entitled.

57.      Section 14 of the Guarantee similarly allows Landlord to recover its fees and costs, including attorneys' fees, incurred in enforcing its rights against the Guarantor.

58.      Landlord has incurred, and will continue to incur, costs and expenses, including attorneys' fees and disbursements, in connection with this action.

59.      Accordingly, Landlord seeks a monetary judgment for its reasonable attorneys' fee and other out-of-pocket costs incurred in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Landlord prays for judgment as follows:

1.      That the Court adjudicate and declare that Tenant has materially breached its obligations under the Sublease;

2.      That the Tenant and Guarantor are liable to Landlord for damages, to be proven at trial but currently estimated to be in excess of $10 million;

3.      That the Court awards Landlord its attorneys' fees and costs, consistent with its rights under the Sublease and Guarantee; and

20542867v.1

4.      That the Court award Landlord such other and further relief as the Court may deem

just and equitable.

Dated:  July 31, 2015                              Respectfully submitted

                                                   Trump Old Post Office LLC


                                                   By:   /s/  Rebecca Woods
                                                         Rebecca Woods (D.C. No. 468495)
                                                         Seyfarth Shaw LLP
                                                         975 F Street, N.W.
                                                         Washington, D.C.  20004
                                                         Telephone:  (202) 463-2400
                                                         Facsimile:  (202) 641-9200
                                                         rwoods@seyfarth.com
                                                         *Counsel for Plaintiff* Trump Old Post Office LLC

20542867v.1